# United States Court of Appeals for the Federal Circuit

---

**INTELLECTUAL VENTURES I LLC,**
*Plaintiff-Appellant*

**v.**

**SYMANTEC CORP.,**
*Defendant-Cross-Appellant*

**TREND MICRO INCORPORATED, TREND MICRO, INC. (USA),**
*Defendants-Appellees*

---

2015-1769, 2015-1770, 2015-1771

---

Appeals from the United States District Court for the District of Delaware in Nos. 1:10-cv-01067-LPS, 1:12-cv-01581-LPS, Chief Judge Leonard P. Stark.

---

Decided: September 30, 2016

---

ERIC F. CITRON, Goldstein & Russell, P.C., Bethesda, MD, argued for plaintiff-appellant. Also represented by THOMAS GOLDSTEIN; BROOKE ASHLEY MAY TAYLOR, PARKER C. FOLSE III, Susman Godfrey L.L.P., Seattle, WA; RICHARD W. HESS, JOHN PIERRE LAHAD, Houston, TX.

DOUGLAS ETHAN LUMISH, Latham & Watkins LLP, Menlo Park, CA, argued for defendant-cross appellant.

Also represented by JEFFREY G. HOMRIG; DEAN G. DUNLAVEY, Costa Mesa, CA; GABRIEL BELL, ROBERT J. GAJARSA, Washington, DC.

YAR ROMAN CHAIKOVSKY, Paul Hastings LLP, Palo Alto, CA, argued for defendants-appellees. Also represented by DARYL STUART BARTOW, BRYAN KEITH JAMES; BLAIR MARTIN JACOBS, Washington, DC.

JAY P. KESAN, University of Illinois, College of Law, Champaign, IL, for amici curiae Jay P. Kesan, Shubha Ghosh, Richard Gruner, Carol M. Hayes, Adam Mossoff, Kristen Osenga, Michael Risch, Mark F. Schultz, Ted Sichelman.

_____

Before DYK, MAYER, and STOLL, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK.

Concurring opinion filed by *Circuit Judge* MAYER.

Opinion dissenting-in-part filed by *Circuit Judge* STOLL.

DYK, *Circuit Judge.*

Intellectual Ventures I LLC ("IV") sued Symantec Corp. and Trend Micro[1] (together, "appellees" or "defendants") for infringement of various claims of U.S. Patent Nos. 6,460,050 ("the '050 patent"), 6,073,142 ("the '142 patent"), and 5,987,610 ("the '610 patent"). The district court held the asserted claims of the '050 patent and the '142 patent to be ineligible under § 101, and the asserted claim of the '610 patent to be eligible. We affirm as to the

_____

[1]    We refer to Trend Micro Incorporated and Trend Micro, Inc. (USA) together as a singular defendant "Trend Micro."

asserted claims of the '050 patent and '142 patent, and reverse as to the asserted claim of the '610 patent.

BACKGROUND

I

IV owns the three patents at issue: the '050 patent, the '142 patent, and the '610 patent. IV sued Symantec and Trend Micro, two developers of anti-malware and anti-spam software, for infringement of various claims of those patents. Against Symantec, IV asserted claims 9, 16, and 22 of the '050 patent; claims 1, 7, 21, and 22 of the '142 patent; and claim 7 of the '610 patent. Against Trend Micro, IV asserted claims 9, 13, 16, 22, and 24 of the '050 patent; and claims 1, 7, 17, 21, 22, 24, and 26 of the '142 patent.

With respect to the two defendants, a § 101 patent eligibility issue arose at different stages of the proceedings. The case against Symantec went to trial. The jury found that Symantec had not proven by clear and convincing evidence that any asserted claims were invalid under §§ 102 and 103. The jury found Symantec had infringed the asserted claims of the '142 patent and '610 patent, and had not infringed any asserted claims of the '050 patent.[2] After trial, Symantec brought a motion under Fed. R. Civ. P. 52(c) for a judgment that all the asserted claims of the three patents-in-suit are unpatentable under 35 U.S.C. § 101, an issue not addressed in the jury verdict.

The case against Trend Micro did not go to trial. Trend Micro brought a motion for summary judgment of

---

[2]    The jury awarded $9 million for infringement of the '142 patent and $8 million for infringement of the '610 patent.

invalidity under § 101 for all of the asserted claims.[3] After Trend Motion had submitted its motion, IV withdrew its assertion of claim 7 of the '610 patent against Trend Micro, the only claim of the '610 patent asserted against Trend Micro. Thus the motions raised issues of patent eligibility as to the '050 and '142 patents with respect to both defendants, and as to the '610 patent only with respect to Symantec.

## II

The '050 patent is entitled, "Distributed Content Identification System." The patent application was filed on December 22, 1999, and the '050 patent issued on October 1, 2002. The patent is directed to methods of screening emails and other data files for unwanted content.

The '142 patent is entitled, "Automated Post Office Based Rule Analysis of E-Mail Messages and Other Data Objects for Controlled Distribution in Network Environments." The patent application was filed on June 23, 1997, and the '142 patent issued on June 6, 2000. The patent is directed to methods of routing e-mail messages based on specified criteria (i.e., rules).

The '610 patent is entitled, "Computer Virus Screening Methods and Systems." The patent application was filed on February 12, 1998, and the patent issued on November 16, 1999. The patent is directed to using computer virus screening in the telephone network.

In both cases the district court determined that the asserted claims of the '050 patent and '142 patent claimed

---

[3]    While Trend Motion did not state under which rule it brought its motion, the district court applied the Fed. R. Civ. P. 56 summary judgment standard, and the parties did not dispute the application of that standard.

ineligible subject matter under 35 U.S.C. § 101, and granted appellees' motions with respect to those patents. The district court held, however, that Symantec had failed to establish that the asserted claim of the '610 patent is patent-ineligible under § 101, and denied Symantec's motion with respect to that patent.

Final judgment was entered in favor of Symantec and Trend Micro that the asserted claims of the '050 and '142 patents are patent-ineligible under 35 U.S.C. § 101. *Id. See* Final Judgment Following Jury Trial ("Symantec Final Judgment")*, Intellectual Ventures I LLC v. Symantec Corp.*, No. 10-cv-1067-LPS (D. Del. March 24, 2016), ECF No. 770 at 2;[4] Judgment, *Intellectual Ventures I LLC v. Trend Micro Inc.*, No. 12-cv-1581-LPS (D. Del. June 17, 2015), ECF No. 234 at 2. This resolved all claims against Trend Micro. With respect to Symantec, the district court entered final judgment in favor of IV that Symantec infringed claim 7 of the '610 patent with damages in the amount of $8 million, and that claim 7 was also not proved invalid by Symantec under 35 U.S.C. §§ 102 or 103, or patent-ineligible under § 101. *See* Symantec Final Judgment at 2.

IV now appeals the district court's ineligibility determinations with respect to the '050 patent and '142 patent as to Symantec and Trend Micro, and Symantec cross-appeals the determination of eligibility for the '610 patent. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

---

[4] The entry of final judgment ripened Symantec's cross-appeal. *See Pause Tech. LLC v. TiVo Inc.*, 401 F.3d 1290, 1295 (Fed. Cir. 2005).

DISCUSSION

I

We review the grant or denial of summary judgment *de novo. See Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000) (en banc). For the district court's entry of judgment under Rule 52(c), we review the district court's factual findings for clear error and its legal conclusions *de novo. See EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 273 (3d Cir. 2010). Patent eligibility under § 101 is an issue of law which we review *de novo. See OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015).

II

Section 101 of title 35 defines patent-eligible subject matter. It provides, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor . . . ." 35 U.S.C. § 101. For over 150 years, the Supreme Court has recognized an implicit exception to these broad categories encompassing "[l]aws of nature, natural phenomena, and abstract ideas[, which] are not patentable." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012) (citation and internal quotation marks omitted); *see also Bilski v. Kappos*, 561 U.S. 593, 601–02 (2010).

In *Mayo* and in *Alice*, the Court set forth a framework for "distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). At *Mayo/Alice* step one, a court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* The category of abstract ideas embraces "fundamental economic practice[s] long prevalent in our system of commerce," *id.* at 2356 (quot-

ing *Bilski*, 561 U.S. at 611), including "longstanding commercial practice[s]" and "method[s] of organizing human activity," *id*. But the category of abstract ideas is not limited to economic or commercial practices or methods of organizing human activity. *See infra* note 5.

If a claim is directed to a patent-ineligible concept, the court must proceed to *Mayo/Alice* step two, and ask, "what else is there in the claims before us?" *Alice*, 134 S. Ct. at 2355 (citation and internal quotation citation omitted). Step two is "a search for an inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id*. (citation and internal quotation marks omitted).

At *Mayo/Alice* step two, the search is for "an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Id*. at 2357 (citation and internal quotation marks omitted). And "[s]imply appending conventional steps, specified at a high level of generality," which are "well known in the art" and consist of "well-understood, routine, conventional activit[ies]" previously engaged in by workers in the field, is not sufficient to supply the inventive concept. *Id*. at 2357, 2359 (citations and internal quotation marks omitted).

## 1. THE '050 PATENT

The district court held patent-ineligible the asserted claims of the '050 patent—claims 9, 13, 16, 22, and 24—directed to filtering e-mails that have unwanted content. We agree with the district court. The parties agree that independent claim 9 is representative. It recites:

9. A method for identifying characteristics of data files, comprising:

receiving, on a processing system, file content identifiers for data files from a plurality of file content identifier generator agents, each agent provided on a source system and creating file content IDs using a mathematical algorithm, via a network;

determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers; and

outputting, to at least one of the source systems responsive to a request from said source system, an indication of the characteristic of the data file based on said step of determining.

'050 patent, col. 8, ll. 13–26. According to IV, this method of filtering emails is used to address the problems of spam e-mail and the use of e-mail to deliver computer viruses.

We agree with the district court that receiving e-mail (and other data file) identifiers, characterizing e-mail based on the identifiers, and communicating the characterization—in other words, filtering files/e-mail—is an abstract idea.

The Supreme Court has held that "fundamental . . . practice[s] long prevalent" are abstract ideas. *Alice*, 134 S. Ct. at 2356. The Supreme Court and we have held that a wide variety of well-known and other activities constitute abstract ideas.[5]

---

[5]     *See, e.g.*, *Bilski*, 561 U.S. at 611 (claims directed to risk hedging); *Alice*, 134 S. Ct. at 2356 (claims directed to idea of intermediated settlement); In re *TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (claims directed to classifying a digital image and storing the image based on its classification); *Mortg. Grader, Inc.*

*v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) (claims drawn to well-known idea of anonymous loan shopping); *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1333 (Fed. Cir. 2015) (claims directed to idea of determining a price using organizational and product group hierarchies); *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) (claims directed to idea of retaining information in the navigation of online forms); *OIP Techs.*, 788 F.3d at 1362–63 (claims directed to offer-based price optimization); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (claims directed to the idea of collecting data, recognizing certain data within the collected data set, and storing that recognized data in a memory); *Ultramercial, Inc. v. Hulu LLC*, 772 F.3d 709, 714–15 (Fed. Cir. 2014) (claims directed to displaying an advertisement in exchange for access to copyrighted media); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (claim directed toward guaranteeing a party's performance in a transaction); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.,* 728 F.3d 1336, 1342 (Fed. Cir. 2013) (claims directed to automated methods for generating task lists); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) (claims directed to processing information through a clearinghouse); *CyberSource Corp. v. Retail Decisions, Inc.,* 654 F.3d 1366, 1373 (Fed. Cir. 2011) (claims directed to a method for verifying the validity of a credit card transaction). *See also McRO, Inc. v. Bandai Namco Games Am. Inc.*, No. 2015-1080, 2016 WL 4896481, at *8–10 (claims "focused on a specific asserted improvement in computer animation, i.e., the automatic use of rules of a particular type" held not to be directed to ineligible subject matter).

Here, it was long-prevalent practice for people receiving paper mail to look at an envelope and discard certain letters, without opening them, from sources from which they did not wish to receive mail based on characteristics of the mail.[6] The list of relevant characteristics could be kept in a person's head. Characterizing e-mail based on a known list of identifiers is no less abstract. The patent merely applies a well-known idea using generic computers "to the particular technological environment of the Internet." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014).

The asserted claims of the '050 patent also resemble claims we have held were directed to an abstract idea. Recently, in *BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*, we held that a claim to a "content filtering system for filtering content retrieved from an Internet computer network[, e.g., to prevent users from accessing certain websites] . . . is [directed to] an abstract idea." 827 F.3d 1341, 1348 (Fed. Cir. 2016).[7] And in *Content Extraction*, 776 F.3d at 1347, *cert. denied*, 136 S. Ct. 119 (2015), we found that the asserted patents were "drawn to the abstract idea of 1) collecting data, 2) recog-

---

[6]    For example, it is common for "an occupant who receives generically addressed mail [to] discard it as junk mail." *Jones v. Flowers*, 547 U.S. 220, 248 (2006) (Thomas, J., dissenting).

[7]    In *BASCOM*, we found the claims patent-eligible because, at step two, the patent claimed "a technology-based solution (not an abstract-idea-based solution implemented with generic technical components in a conventional way) to filter content on the Internet that overcomes existing problems with other Internet filtering systems." 827 F.3d at 1351.

nizing certain data within the collected data set, and 3) storing that recognized data in a memory."

Because we hold the asserted claims of the '050 patent are directed to an abstract idea, we proceed to *Mayo/Alice* step two to determine whether the claims contain an "inventive concept" that renders them patent-eligible. Claims that "amount to nothing significantly more than an instruction to apply [an] abstract idea . . . using some unspecified, generic computer" and in which "each step does no more than require a generic computer to perform generic computer functions" do not make an abstract idea patent-eligible, *Alice*, 134 S. Ct. at 2359–60 (citations and internal quotation marks omitted), because "claiming the improved speed or efficiency inherent with applying the abstract idea on a computer" does not "provide a sufficient inventive concept." *Intellectual Ventures I LLC v. Capital One Bank (USA)* ("*Intellectual Ventures v. Capital One Bank*"), 792 F.3d 1363, 1367 (Fed. Cir. 2015).

IV argues that the jury verdict determined that Symantec's proffered prior art did not anticipate or render obvious the asserted claims of the '050 patent, and that the jury's anticipation and obviousness determination is inconsistent with a determination that the claims are patent-ineligible. While the claims may not have been anticipated or obvious because the prior art did not disclose "determining . . . whether each received content identifier matches a characteristic" or "outputting . . . an indication of the characteristic of the data file," that does not suggest that the idea of "determining" and "outputting" is not abstract, much less that its implementation is not routine and conventional.

Indeed, "[t]he 'novelty' of any element or steps in a process, or even of the process itself, is of *no relevance* in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." *Diamond v. Diehr*, 450 U.S. 175, 188–89 (1981)

(emphasis added); *see also Mayo*, 132 S. Ct. at 1303–04 (rejecting "the Government's invitation to substitute §§ 102, 103, and 112 inquiries for the better established inquiry under § 101").[8] Here, the jury's general finding that Symantec did not prove by clear and convincing evidence that three particular prior art references do not disclose all the limitations of or render obvious the asserted claims does not resolve the question of whether the claims embody an inventive concept at the second step of *Mayo/Alice*.

The steps of the asserted claims of the '050 patent do not "improve the functioning of the computer itself," *Alice*, 134 S. Ct. at 2359, for example by disclosing an "improved, particularized method of digital data compression," *DDR Holdings*, 773 F.3d at 1259, or by improving "the way a computer stores and retrieves data in memory," *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016). Rather, these claims use generic computers to perform generic computer functions.

In *Intellectual Ventures v. Capital One Bank*, we found abstract an Internet-based method for "tracking financial transactions to determine whether they exceed a pre-set spending limit (i.e., budgeting)." 792 F.3d at 1367. The fact that "the claims recite[d] budgeting using a 'communication medium' (broadly including the Internet and telephone networks), . . . [did] not render the claims any less abstract." *Id.* We also found abstract claims

---

8  *See also Parker v. Flook*, 437 U.S. 584, 588 (1978) ("This case turns entirely on the proper construction of § 101 . . . . It does not involve the familiar issues of novelty and obviousness that routinely arise under §§ 102 and 103 when the validity of a patent is challenged. For the purpose of our analysis, we assume that respondent's formula is novel and useful and that he discovered it.").

related to "customizing [website] information based on (1) information known about the user and (2) navigation data," and similarly held that "a generic web server with attendant software . . . 'tasked with tailoring information and providing it to the user' provides no additional limitation beyond applying an abstract idea, restricted to the Internet, on a generic computer." *Id.* at 1370–71.

The claims here are also distinguishable from those in *BASCOM*, which allegedly improved an existing technological process by describing "how [a] particular arrangement of elements is a technical improvement over prior art ways of filtering [Internet] content," i.e., "a filter implementation versatile enough that it could be adapted to many different users' preferences while also installed remotely in a single location." 827 F.3d at 1350. There is not, in the '050 patent, any "specific or limiting recitation of . . . improved computer technology," *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (en banc) (Lourie, J., concurring), as the asserted claims describe only generic computer elements.

Finally, IV argues that the '050 patent "shrink[s] the protection gap and moot[s] the volume problem." IV's Opening Br. at 14. According to IV, the protection gap is "the period of time between identification of a computer virus by an anti-malware provider and distribution of that knowledge to its users." *Id.* at 10. The volume problem is the "exponential growth in malware and spam," increasing the amount of antivirus signatures to be downloaded. *Id.* at 12–13. However, the asserted claims do not contain any limitations that address the protection gap or volume problem, e.g., by requiring automatic updates to the antivirus or antispam software or the ability to deal with a large volume of such software. We have explained that, "for a perceived abstract idea, if the *claim* 'contains an "inventive concept" sufficient to "transform" the claimed abstract idea into a patent-eligible application,' then the claims pass the test of eligibility under section 101."

*Internet Patents Corp.*, 790 F.3d at 1347 (emphasis added) (quoting *Alice*, 134 S. Ct. at 2357). But when a claim directed to an abstract idea "contains no restriction on how the result is accomplished . . . [and] [t]he mechanism . . . is not described, although this is stated to be the essential innovation[,]" *id.* at 1348, then the claim is not patent-eligible.

The asserted claims of the '050 patent are not patent-eligible under § 101.

### 2. THE '142 PATENT

The district court held ineligible claims 1, 7, 17, 22, 24, and 26 of the '142 patent, which relate to systems and methods for receiving, screening, and distributing e-mail, and we agree. According to IV, claim 1 is representative of how the '142 patent screens e-mail,[9] and recites:

> 1. A post office for receiving and redistributing e-mail messages on a computer network, the post office comprising:
>
> a receipt mechanism that receives an e-mail message from a sender, the e-mail message having at least one specified recipient;

---

[9]    Defendants agree, and IV does not dispute, that "[a]ll of the claims are substantially similar and no party claims that they differ in any manner relevant" to the § 101 analysis. Opening Br. of Cross-Appellant Symantec Corp. at 10. We focus on claim 1 of the '142 patent, which IV states is representative. Addressing each of the asserted claims is unnecessary when "all the claims are substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348 (internal quotation marks and citation omitted).

a database of business rules, each business rule specifying an action for controlling the delivery of an e-mail message as a function of an attribute of the e-mail message;

a rule engine coupled to receive an e-mail message from the receipt mechanism and coupled to the database to selectively apply the business rules to the e-mail message to determine from selected ones of the business rules a set of actions to be applied to the e-mail message; and

a distribution mechanism coupled to receive the set of actions from the rule engine and apply at least one action thereof to the e-mail message to control delivery of the e-mail message and which in response to the rule engine applying an action of deferring delivery of the e-mail message, the distribution engine automatically combines the e-mail message with a new distribution list specifying at least one destination post office for receiving the e-mail message for review by an administrator associated with the destination post office, and a rule history specifying the business rules that were determined to be applicable to the e-mail message by at least one rule engine, and automatically delivers the e-mail message to a first destination post office on the distribution list instead of a specified recipient of the e-mail message.

'142 patent, col. 27, ll. 2–32.

The written description is particularly useful in determining what is well-known or conventional. *See, e.g.*, *Internet Patents Corp.*, 790 F.3d at 1348. The '142 patent's abstract describes the invention as "[a] system, method and various software products . . . for automatic deferral and review of e-mail messages and other data objects in a networked computer system, by applying business rules

to the messages as they are processed by post offices." '142 patent, Abstract. Claim 1 also describes the patented system as a "post office"—albeit an electronic one. '142 patent, col. 27, ll. 2. The district court held that "the asserted claims of the '142 patent are directed to human-practicable concepts, which could be implemented in, for example, a brick-and-mortar post office." J.A. 35.

We agree, and think the district court's analogy to a corporate mailroom is also useful. Such mailrooms receive correspondence, keep business rules defining actions to be taken regarding correspondence based on attributes of the correspondence, apply those business rules to correspondence, and take certain actions based on the application of business rules. Those actions include gating the message for further review,[10] as in claim 1, and also releasing, deleting, returning, or forwarding the message, as described elsewhere in the '142 patent, *see, e.g.*, col. 3, ll. 30–39.

Indeed, in recounting the background of the invention, the patent states,

[m]any corporate organizations have elaborate methods to control the flow of memorandum, publications, notices, and other printed information within the organization. An organization may limit the types of documents employees can distribute at work, and in some cases, control which persons within an organization communicate with each other. . . . These various rules are typically docu-

---

[10]    The specification states, "[f]or example, a business rule to gate an e-mail for further review may be triggered for any e-mail message that is addressed to the president of the company." '142 patent, col. 3, 45–48.

mented as part of the organization's business communication policies.

*Id.* at col. 1, ll. 15–33. Thus, the '142 patent itself demonstrates that the claimed systems and methods of screening messages are abstract ideas, "fundamental . . . practice[s] long prevalent in our system" and "method[s] of organizing human activity." *Alice*, 134 S. Ct. at 2356 (citations and internal quotation marks omitted); *see also Intellectual Ventures v. Capital One Bank*, 792 F.3d at 1369.

And IV itself informed the district court, in its technology tutorial, "[i]n the typical environment, the post office resides on a mail server, where the company's emails are received, processed, and routed to recipients. Conceptually, this post office is not much different than a United States Postal Service office that processes letters and packages, except that the process is all computer-implemented and done electronically in a matter of seconds." J.A. 40.

This demonstrates that the concept is well-known and abstract. Furthermore, with the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper. *See CyberSource*, 654 F.3d at 1371–72. Indeed, the specification expressly states that one type of post office, the gatekeeping post office, which "provides for administrative review and processing of gated messages . . . provides for both manual review by a gatekeeper—a person designated to review gated messages—and automatic review and processing." '142 patent, col. 7, ll. 31–35; *see also id.* at col. 11, ll. 7–10. The '142 patent is directed to a conventional business practice—the screening of messages by corporate organizations—in the context of electronic communications.

Since the claims are directed to an abstract idea, we proceed to *Mayo/Alice* step two. According to the specification, the claims can "operate[] on a conventional communications network." *Id.* at col. 5, l. 46. The post offices are "[c]ommunicatively coupled to the network through conventional e-mail protocols," and "conventional mail servers and conventional post office/mail server combinations may be present." *Id.* at col. 5, ll. 48–49, 55–57. The patent discloses only generic computers performing generic functions: "[t]he [Rule Enforcing Post Offices] and [Gatekeeping Post Offices] are preferably implemented as software products executing on conventional server-class computers, such as . . . IBM compatible computers based on Intel Inc.'s Pentium™ processors. The servers operate in conjunction with conventional operating systems, such as UNIX™, or Microsoft Corp.'s Windows95™ or WindowNT™." *Id.* at col. 9, ll. 51–58. The specification thus confirms that the implementation of the abstract idea is routine and conventional. The '142 patent does not "improve the functioning of the computer itself." *Alice*, 134 S. Ct. at 2359 (citation omitted). Nor does it solve a "challenge particular to the Internet." *DDR Holdings*, 773 F.3d at 1257.

IV argues that the claims do not merely require routine and conventional use of computers and the Internet because "applying business rules to email is not what computers and the Internet do in the absence of this claim limitation" and "because computers and the Internet do not have 'rule engines' as a matter of course." IV's Opening Br. at 54. But the inquiry is not whether conventional computers already apply, for example, well-known business concepts like hedging or intermediated settlement. Rather, we determine whether "each step does *no more than require* a generic computer to perform generic computer functions." *Alice*, 134 S. Ct. at 2359 (emphasis added). Here that is the case.

The asserted claims of the '142 patent are not patent-eligible under § 101.

### 3. THE '610 PATENT

Claim 7 is the only asserted claim of the '610 patent. The district court held eligible claim 7 of the '610 patent. Claim 7 depends from claim 1, which provides:

> 1. A virus screening method comprising the steps of:
>
> routing a call between a calling party and a called party of a telephone network;
>
> receiving, within the telephone network, computer data from a first party selected from the group consisting of the calling party and the called party;
>
> detecting, within the telephone network, a virus in the computer data; and
>
> in response to detecting the virus, inhibiting communication of at least a portion of the computer data from the telephone network to a second party selected from the group consisting of the calling party and the called party.

'610 patent, col. 14, ll. 34–47. Claim 7 recites:

> 7. The virus screening method of claim 1 further comprising the step of determining that virus screening is to be applied to the call based upon at least one of an identification code of the calling party and an identification code of the called party.

*Id.* at col. 14, l. 66–col. 15 l. 3.

Unlike the asserted claims of the '050 and '142 patents, claim 7 involves an idea that originated in the computer era—computer virus screening. But the idea of

virus screening was nonetheless well known when the '610 patent was filed. Performing virus screening was a long prevalent practice in the field of computers, and, as the patent admits, performed by many computer users. The patent acknowledges that, prior to the invention, "[m]any computer users [had] virus screening and detection software installed on their computers." *Id.* at col. 1, ll. 10–11. Claim 7 of the '610 patent, however, does not claim a new method of virus screening or improvements thereto—in fact, it requires only "detecting . . . a virus in the computer data." *Id.* at col. 14, ll. 40–41. The specification recites conventional "virus screening software." *See, e.g.,* '610 patent, col. 3, ll. 35–39. By itself, virus screening is well-known and constitutes an abstract idea.

At step two of *Mayo/Alice*, there is no other aspect of the claim that is anything but conventional.

The '610 patent is directed to the use of well-known virus screening software within the telephone network[11] or the Internet. We have previously determined that performing otherwise abstract activity on the Internet does not save the idea from being patent-ineligible. As we said in *Intellectual Ventures v. Capitol One Bank*, "[a]n abstract idea does not become nonabstract by limiting the invention to a particular . . . technological environment, such as the Internet. . . . [W]hile the claims recite budgeting using a 'communication medium' (broadly including the Internet and telephone networks), that limitation does not render the claims any less abstract." 792 F.3d at 1366–67. *See also Ultramercial*, 772 F.3d at 716 (Fed. Cir.

---

[11]   The district court construed "within the telephone network" to mean "in the voice or data network connecting the calling party and called party, exclusive of the networks and gateway nodes of the called party and calling party." J.A. 276.

2014) ("The claims' invocation of the Internet also adds no inventive concept. As we have held, the use of the Internet is not sufficient to save otherwise abstract claims from ineligibility under § 101.").[12]

Just as performance of an abstract idea on the Internet is abstract, so too the performance of an abstract concept in the environment of the telephone network is abstract, as *Intellectual Ventures v. Capitol One Bank* recognized. Our recent decision in *TLI Communications* involved a similar situation. There, we held that a challenged claim was "drawn to the concept of classifying an image and storing the image based on its classification." 823 F.3d at 611. This was abstract because "[w]hile the [asserted claim] requires concrete, tangible components such as 'a telephone unit' and a 'server,' the specification makes clear that the recited physical components merely provide a generic environment in which to carry out the abstract idea of classifying and storing digital images in an organized manner." *Id*. Here, the recitation of a "telephone network," like the telephone unit and server in *TLI Communications*, merely provides a "generic environment" in which to carry out the well-known and abstract idea of virus screening.

Nor does the asserted claim improve or change the way a computer functions. Claim 7 recites no more than generic computers that use generic virus screening technology. But the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358. "For

---

[12] *See also, e.g.*, *buySAFE*, 765 F.3d at 1355 ("The computers in *Alice* were receiving and sending information over networks connecting the intermediary to the other institutions involved, and the Court found the claimed role of the computers insufficient.").

the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction*, 776 F.3d at 1347–48 (quoting *Alice*, 134 S. Ct. at 2359).

As the district court determined, claim 7 calls for at least three computers: the computer of the first party or sending party, the virus screening computer, and the computer of the second or receiving party. The sending and receiving computers can be generic—they perform only sending and receiving functions. *See buySAFE*, 765 F.3d at 1352, 1355. The virus screening computer fares no better. According to the specification, "[v]irus screening can be facilitated in the telephone network using either a *conventional* telephone network processor adapted to run associated virus screening software or an additional processor which runs virus screening software. . . . The processor can augment *conventional* circuit-switched network elements . . . ." '610 patent, col. 3, ll. 35–39, 49–50 (emphasis added). "As is well known, each of the virus-screening processors can have one or more associated modems to modulate computer data for transmission, and to demodulate received computer data." *Id.* at col. 4, ll. 58–61. There is no indication that the virus screening software installed on a conventional telephone network processor is any different than the virus screening software "[m]any computer users have . . . installed on their computers." *Id.* at col. 1, ll. 10–11. These "generic computer components [are] insufficient to add an inventive concept to an otherwise abstract idea." *TLI Commc'ns*, 823 F.3d at 614.

IV argues that "[t]he claims of the '610 Patent include meaningful limitations that narrow the claimed invention to a specific way of screening for computer viruses *within the telephone network* . . . and does not preempt all virus detection." IV's Response and Reply Br. at 55. A narrow

claim directed to an abstract idea, however, is not necessarily patent-eligible, for "[w]hile preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015); *see also OIP Techs.*, 788 F.3d at 1362–63 ("[T]hat the claims do not preempt all price optimization or may be limited to price optimization in the e-commerce setting do not make them any less abstract.").

In summary, unlike the claims at issue in *Enfish*, which involved a "specific type of data structure designed to improve the way a computer stores and retrieves data in memory," 822 F.3d at 1339, claim 7 of the '610 patent does not improve or change the way a computer functions. Nor does claim 7 overcome a problem unique to the Internet as was the case in *DDR Holdings*. 773 F.3d at 1258–59.

Citing *BASCOM*, the dissent argues that "claim 7 constitutes an improvement of the network itself and, thus, focuses on improving computers as tools." Dissenting Op. at 5. Contrary to the dissent, this case is unlike *BASCOM*, where, "[o]n [a] limited record" and when viewed in favor of the patentee, the claims alleged a "technical improvement over prior art ways of filtering [Internet] content." 827 F.3d at 1350. The patent in *BASCOM* did not merely move existing content filtering technology from local computers to the Internet,[13] which "would not contain an inventive concept," but "overc[a]me[] existing problems with other Internet

---

[13]  Indeed, in *BASCOM*, the patent specification acknowledged that several prior art systems already performed content filtering at either local or remote servers. *See* 827 F.3d at 1344.

filtering systems"—*i.e.*, it solved the problem of "inflexible one-size-fits-all" remote filtering schemes (caused by simply moving filtering technology to the Internet) by enabling individualized filtering at the ISP server. *Id* at 1350–51. In other words, the patent in *BASCOM* did not purport to improve the Internet itself by introducing prior art filtering technology to the Internet. Rather, the *BASCOM* patent fixed a problem presented by combining the two. Here the record does not indicate that claim 7 recites any improvement to conventional virus screening software, nor does claim 7 solve any problem associated with situating such virus screening on the telephone network.

The dissent nonetheless urges that there are two advantages to using virus screening on the telephone network that qualify as inventive concepts: (1) shifting virus detection away from the networks of the sender and recipient, which allows users to communicate over a network without concern of receiving computer viruses; and (2) closing the "protection gap," *i.e.*, the problem of individual computer users having to periodically update their virus screening software. Dissenting Op. at 2.

Regarding shifting virus detection to the telephone network, the claimed inventive solution of claim 7 is to utilize an intermediary computer in forwarding information. But that solution is perfectly conventional and is applied any time an e-mail recipient performs virus screening and, acting as an intermediary, forwards the e-mail to another recipient. As discussed above, there is no claim here describing a particular method of incorporating virus screening into the Internet.[14] To be sure, it may

---

[14]    *See Affinity Labs of Tex., LLC v. DirecTV, LLC*, No. 2015-1845 (Fed. Cir. Sept. 23, 2016), slip op. at 16 (holding patent ineligible where it "d[id] not provide an

be that other claims that recite particular features of intermediate computers (e.g., modeling to match the recipient's computer architecture) incorporate an inventive concept, but those claims are not before us.

As to the protection gap, claim 7 of the '610 patent does not describe or require a solution to the protection gap. *See supra* at 13–14 (explaining that the language of the challenged claims of the '050 patent do not address the protection gap). The district court erred in relying on technological details set forth in the patent's specification and not set forth in the claims to find an inventive concept. *See Accenture*, 728 F.3d at 1345 ("[T]he complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method."); *Content Extraction*, 776 F.3d at 1346 ("We focus here on whether the *claims* of the asserted patents fall within the excluded category of abstract ideas.") (emphasis added).

As we explained in *TLI Communications*, the claim here is "not directed to a specific improvement to computer functionality. Rather, [it is] directed to the use of conventional or generic technology in a nascent but well-known environment, without any claim that the invention reflects an inventive solution to any problem presented by combining the two." 823 F.3d at 612

Claim 7 of the '610 patent is not patent-eligible under § 101.

---

inventive solution to a problem in implementing the idea of remote delivery of regional broadcasting; it simply recite[d] that the abstract idea of remote delivery will be implemented using the conventional components and functions generic to cellular telephones.").

**AFFIRMED-IN-PART AND REVERSED-IN-PART**

COSTS

Costs to defendants.

# United States Court of Appeals for the Federal Circuit

---

**INTELLECTUAL VENTURES I LLC,**
*Plaintiff-Appellant*

**v.**

**SYMANTEC CORP.,**
*Defendant-Cross-Appellant*

**TREND MICRO INCORPORATED, TREND MICRO, INC. (USA),**
*Defendants-Appellees*

---

2015-1769, 2015-1770, 2015-1771

---

Appeals from the United States District Court for the District of Delaware in Nos. 1:10-cv-01067-LPS, 1:12-cv-01581-LPS, Chief Judge Leonard P. Stark.

---

MAYER, *Circuit Judge*, concurring.

I agree that all claims on appeal fall outside of 35 U.S.C. § 101. I write separately, however, to make two points: (1) patents constricting the essential channels of online communication run afoul of the First Amendment; and (2) claims directed to software implemented on a generic computer are categorically not eligible for patent.

I.

"[T]he Constitution protects the right to receive information and ideas. . . . This right to receive information and ideas, regardless of their social worth, is fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (citations omitted). Patents, which function as government-sanctioned monopolies, invade core First Amendment rights when they are allowed to obstruct the essential channels of scientific, economic, and political discourse. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000) ("The distinction between laws burdening and laws banning speech is but a matter of degree."); *see also In re Tam*, 808 F.3d 1321, 1340 (Fed. Cir. 2015) (en banc) (explaining that the government may impermissibly burden speech "even when it does so indirectly").

Although the claims at issue here disclose no new technology, they have the potential to disrupt, or even derail, large swaths of online communication. U.S. Patent No. 6,460,050 (the "'050 patent") purports to cover methods of "identifying characteristics of data files," '050 patent, col. 8 l. 13, whereas U.S. Patent No. 6,073,142 (the "'142 patent") broadly claims systems and methods which allow an organization to control internal email distribution, '142 patent, col. 1 ll. 15–34. U.S. Patent No. 5,987,610 (the "'610 patent") describes, in sweeping terms, screening a communication for viruses or other harmful content at an intermediary location before delivering it to an addressee. *See* '610 patent, col. 14 ll. 34–47. The asserted claims speak in vague, functional language, giving them the elasticity to reach a significant slice of all email traffic. *See Gottschalk v. Benson*, 409 U.S. 63, 69 (1972) ("*Benson*") (explaining that claims are patent eligible only if they contain limitations "sufficiently definite to confine the patent monopoly within rather definite bounds"). Indeed, the claims of the '610 patent could reasonably be read to cover most methods of screening for

harmful content while data is being transmitted over a network. *See* '610 patent, col. 1 ll. 59–61 (describing "screen[ing] computer data for viruses within a telephone network before communicating the computer data to an end user").

Suppression of free speech is no less pernicious because it occurs in the digital, rather than the physical, realm. "[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (citations and internal quotation marks omitted). Essential First Amendment freedoms are abridged when the Patent and Trademark Office ("PTO") is permitted to balkanize the Internet, granting patent owners the right to exact heavy taxes on widely-used conduits for online expression.

Like all congressional powers, the power to issue patents and copyrights is circumscribed by the First Amendment. *See Golan v. Holder*, 132 S. Ct. 873, 889–93 (2012); *Eldred v. Ashcroft*, 537 U.S. 186, 219–21 (2003). In the copyright context, the law has developed "built-in First Amendment accommodations." *Eldred*, 537 U.S. at 219; *see also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 201 (1985) (noting that the Lanham Act contains safeguards to prevent trademark protection from "tak[ing] from the public domain language that is merely descriptive"). Specifically, copyright law "distinguishes between ideas and expression and makes only the latter eligible for copyright protection." *Eldred*, 537 U.S. at 219; *see also Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 556 (1985) (explaining that "copyright's idea/expression dichotomy" supplies "a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression" (citations and internal

quotation marks omitted)). It also applies a "fair use" defense, permitting members of "the public to use not only facts and ideas contained in a copyrighted work, but also expression itself in certain circumstances." *Eldred*, 537 U.S. at 219; *see* 17 U.S.C. § 107 ("[T]he fair use of a copyrighted work, including such use by reproduction in copies . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.").

Just as the idea/expression dichotomy and the fair use defense serve to keep copyright protection from abridging free speech rights, restrictions on subject matter eligibility can be used to keep patent protection within constitutional bounds. Section 101 creates a "patent-free zone" and places within it the indispensable instruments of social, economic, and scientific endeavor. *See Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (emphasizing that the "building blocks of human ingenuity" are patent ineligible); *Benson*, 409 U.S. at 67 (stating that "mental processes . . . and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work"). Online communication has become a "basic tool[]," *Benson*, 409 U.S. at 67, of modern life, driving innovation and supplying a widely-used platform for political dialogue. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (noting that the Internet "is a ubiquitous information-transmitting medium"); *see also U.S. Telecom Ass'n v. Fed. Commc'n Comm'n*, 825 F.3d 674, 698 (D.C. Cir. 2016) (explaining that online communication "has transformed nearly every aspect of our lives, from profound actions like choosing a leader, building a career, and falling in love to more quotidian ones like hailing a cab and watching a movie"). Section 101, if properly applied, can preserve the Internet's open architecture and weed out those

patents that chill political expression and impermissibly obstruct the marketplace of ideas.

As both the Supreme Court and this court have recognized, section 101 imposes "a threshold test," *Bilski v. Kappos*, 561 U.S. 593, 602 (2010), one that must be satisfied before a court can proceed to consider subordinate validity issues such as non-obviousness under 35 U.S.C. § 103 or adequate written description under 35 U.S.C. § 112. *See Parker v. Flook*, 437 U.S. 584, 593 (1978) ("*Flook*") ("The obligation to determine what type of discovery is sought to be patented" so as to determine whether it falls within the ambit of section 101 "must precede the determination of whether that discovery is, in fact, new or obvious."); *In re Comiskey*, 554 F.3d 967, 973 (Fed. Cir. 2009) ("Only if the requirements of § 101 are satisfied is the inventor allowed to pass through to the other requirements for patentability, such as novelty under § 102 and . . . non-obviousness under § 103." (citations and internal quotation marks omitted)); *State St. Bank & Trust Co. v. Signature Fin. Grp., Inc.*, 149 F.3d 1368, 1372 n.2 (Fed. Cir. 1998) (explaining that section 101 is "[t]he first door which must be opened on the difficult path to patentability" (citations and internal quotation marks omitted)). Indeed, if claimed subject matter is not even *eligible* for patent protection, any pronouncement on whether it is novel or adequately supported by the written description constitutes an impermissible advisory opinion. *See, e.g.*, *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (emphasizing that Article III courts "do not render advisory opinions" (citations and internal quotation marks omitted)).

The public has a "paramount interest in seeing that patent monopolies . . . are kept within their legitimate scope." *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144 (2016) (citations and internal quotation marks omitted); *see also Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 851 (2014). Nowhere is

that interest more compelling than in the context of claims that threaten fundamental First Amendment freedoms. *See Palko v. Connecticut*, 302 U.S. 319, 326–27 (1937) ("[F]reedom of thought and speech . . . is the matrix, the indispensable condition, of nearly every other form of freedom."). "As the most participatory form of mass speech yet developed, the Internet deserves the highest protection from governmental intrusion." *ACLU v. Reno*, 929 F. Supp. 824, 883 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997). A robust application of section 101 at the outset of litigation will ensure that the essential channels of online communication remain "free to all men and reserved exclusively to none," *Funk Brothers Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948).

## II.

Most of the First Amendment concerns associated with patent protection could be avoided if this court were willing to acknowledge that *Alice* sounded the death knell for software patents. The claims at issue in *Alice* were directed to a computer-implemented system for mitigating settlement risk. 134 S. Ct. at 2352–53. Although the petitioners argued that their claims were patent eligible because they were tied to a computer and a computer is a tangible object, the Supreme Court unanimously and emphatically rejected this argument. *Id.* at 2358–60. The Court explained that the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 2358. Accordingly, "[t]he fact that a computer necessarily exist[s] in the physical, rather than purely conceptual, realm is beside the point" in the section 101 calculus. *Id.* (citations and internal quotation marks omitted).

Software is a form of language—in essence, a set of instructions. *See Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 447 (2007) (explaining that "software" is "the set of instructions, known as code, that directs a computer to

perform specified functions or operations" (citations and internal quotation marks omitted)); *see also* 17 U.S.C. § 101 (defining a "'computer program,'" for purposes of the Copyright Act, as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result"). It is inherently abstract because it is merely "an *idea* without physical embodiment," *Microsoft*, 550 U.S. at 449 (emphasis added). Given that an "idea" is not patentable, *see, e.g.*, *Benson*, 409 U.S. at 67, and a generic computer is "beside the point" in the eligibility analysis, *Alice*, 134 S. Ct. at 2358, all software implemented on a standard computer should be deemed categorically outside the bounds of section 101.

The central problem with affording patent protection to generically-implemented software is that standard computers have long been ceded to the public domain. *See Flook*, 437 U.S. at 593 n.15 ("[I]n granting patent rights, the public must not be deprived of any rights that it theretofore freely enjoyed" (citations and internal quotation marks omitted)). Because generic computers are ubiquitous and indispensable, in effect *the* "basic tool[]," *Benson*, 409 U.S. at 67, of modern life, they are not subject to the patent monopoly. In the section 101 calculus, adding software (which is as abstract as language) to a conventional computer (which rightfully resides in the public domain) results in a patent eligibility score of zero. *See Alice*, 134 S. Ct. at 2358 ("Stating an abstract idea while adding the words 'apply it with a computer' simply combines those two steps, with the same deficient result.").

Software lies in the antechamber of patentable invention. Because generically-implemented software is an "idea" insufficiently linked to any defining physical structure other than a standard computer, it is a precursor to technology rather than technology itself. *See Mackay Radio & Tel. Co. v. Radio Corp.*, 306 U.S. 86, 94 (1939) ("While a scientific truth, or the mathematical expression

of it, is not patentable invention, a novel and useful structure created with the aid of knowledge of scientific truth may be."). It is well past time to return software to its historical dwelling place in the domain of copyright. *See Benson*, 409 U.S. at 72 (citing a report from a presidential commission explaining that copyright is available to protect software and that software development had "undergone substantial and satisfactory growth" even without patent protection (citations and internal quotation marks omitted)); *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1380 (Fed. Cir. 2014) (noting that "several commentators" have "argue[d] that the complex and expensive patent system is a terrible fit for the fast-moving software industry" and that copyright provides "[a] perfectly adequate means of protecting and rewarding software developers for their ingenuity" (citations and internal quotation marks omitted)); Peter S. Menell, *An Analysis of the Scope of Copyright Protection for Application Programs*, 41 Stan. L. Rev. 1045, 1076 (1989) (explaining that patents were historically "not seen as a viable option for the protection of most application program code" and that many software programs "simply do not manifest sufficient novelty or nonobviousness to merit patent protection").

Software development has flourished despite—not because of—the availability of expansive patent protection. *See* Brief of Amicus Curiae Elec. Frontier Found. in Support of Respondents, *Alice*, 134 S. Ct. 2347 (No. 13-298), 2014 WL 828047, at *6–7 ("EFF Brief") ("The software market began its rapid increase in the early 1980s . . . more than a decade *before* the Federal Circuit concocted widespread software patents in 1994. . . . Obviously, no patents were needed for software to become a $60 billion/year industry by 1994."); Mark A. Lemley, *Software Patents and the Return of Functional Claiming*, 2013 Wis. L. Rev. 905, 935 (2013) ("Software patents . . . have created a large number of problems for the industry,

particularly for the most innovative and productive companies. . . . [T]he existence of a vibrant open source community suggests that innovation can flourish in software absent patent protection." (footnote omitted)); Wendy Seltzer, *Software Patents and/or Software Development*, 78 Brook. L. Rev. 929, 930 (2013) ("Seltzer") ("Present knowledge and experience now offer sufficient evidence that patents disserve software innovation."); Arti K. Rai, John R. Allison, & Bhaven N. Sampat, *University Software Ownership and Litigation: A First Examination*, 87 N.C. L. Rev. 1519, 1555–56 (2009) ("While most small biotechnology firms that receive venture financing have patents, the available empirical evidence indicates that most software start-ups that receive venture financing, particularly in the first round, do not have patents.").

From an eligibility perspective, software claims suffer from at least four insurmountable problems. First, their scope is generally vastly disproportionate to their technological disclosure. In assessing patent eligibility, "the underlying functional concern . . . is a *relative* one: how much future innovation is foreclosed relative to the contribution of the inventor." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1303 (2012); *see also Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 513 (1917) ("[T]he inventor [is entitled to] the exclusive use of just what his inventive genius has discovered. It is all that the statute provides shall be given to him and it is all that he should receive, for it is the fair as well as the statutory measure of his reward for his contribution to the public stock of knowledge."). Software patents typically do not include any actual code developed by the patentee, but instead describe, in intentionally vague and broad language, a particular goal or objective. *See* Dan L. Burk & Mark A. Lemley, *Is Patent Law Technology-Specific?*, 17 Berkeley Tech. L. J. 1155, 1164–65 (2002) ("Unfortunately, the Federal Circuit's peculiar direction in the software enablement cases has

effectively nullified the disclosure requirement for software patents. And since source code is normally kept secret, software patentees generally disclose little or no detail about their programs to the public." (footnote omitted)). Here, for example, the '610 patent discusses the objective of "screen[ing] computer data for viruses . . . before communicating the computer data to an end user," '610 patent, col. 1 ll. 59–61, but fails to disclose any specific, inventive guidance for achieving that goal. In effect, the '610 patent, like most software patents, describes a desirable destination but neglects to provide any intelligible roadmap for getting there.

A second, and related, problem with software patents is that they provide incentives at the wrong time. Because they are typically obtained at the "idea" stage, before any real inventive work has been done, such patents are incapable of effectively incentivizing meaningful advances in science and technology. "A player focused on patenting can obtain numerous patents without developing any of the technologies to useful levels of deployment or disclosure, leaving a minefield of abstract patent claims for others who actually deploy software." Seltzer, 78 Brook. L. Rev. at 931. Here, for example, it took no significant inventive effort to recognize that communications should be screened for harmful content before delivery. The hard work came later, when software developers created screening systems capable of preventing our email boxes from being overrun with spam or disabled by viruses. Granting patents on software "ideas"—before they have been actually reduced to practice—has created a perverse incentive scheme. Under our current regime, those who scamper to the PTO early, often equipped with little more than vague notions about using computers to automate well-known business and social practices, can reap hefty financial dividends. By contrast, those who actually create and deploy useful computer-centric products are "rewarded" with mammoth potential infringe-

ment liability. *See id.* at 972 ("In software . . . the long road from idea to implementation often snags on patents early in the course. Engineers can describe what they want software to do—in terms that have been sufficient for the PTO—well before they have made it work. Pressures to patent early produce a thicket of pre-implementation claims."); EFF Brief, 2014 WL 828047, at *23 (describing a study which "found that between 2007 and 2011, 46 percent of patent lawsuits involved software patents, accounting for 89 percent of the increase in the number of patent defendants during this timeframe").

Yet another intractable problem with software patents is their sheer number. *See* Brief Of Amici Curiae Checkpoint Software, Inc. et al. in Support of Respondents, *Alice*, 134 S. Ct. 2347 (No. 13-298), 2014 WL 828039, at *8 ("[B]ecause computer products—as opposed to patents—inevitably integrate complex, multicomponent technology, any given product is potentially subject to a large number of patents. . . . Some industry experts have estimated that 250,000 patents go into a modern smartphone." (citations omitted)). Given the vast number of software patents—most of which are replete with broad, functional claims—it is virtually impossible to innovate in any technological field without being ensnared by the patent thicket. *See id.* (describing the "overwhelming set of overlapping patent rights that impede innovation"). Software patents impose a deadweight loss on the nation's economy, erecting often insurmountable barriers to innovation and forcing companies to expend exorbitant sums defending against meritless infringement suits. *See* Shawn P. Miller, *"Fuzzy" Software Patent Boundaries and High Claim Construction Reversal Rates*, 17 Stan. Tech. L. Rev. 809, 810 (2014) ("Patent litigation is so expensive it has been described as the sport of kings. . . . These expenses, however, may be dwarfed by the social cost of patent litigation in reducing incentives for producers to bring

innovative products to market." (footnote and internal quotation marks omitted)).

Fourth, and most fundamentally, generically-implemented software invariably lacks the concrete borders the patent law demands. *See, e.g.*, *Digital Equip. Corp. v. AltaVista Tech., Inc.*, 960 F. Supp. 456, 462 (D. Mass. 1997) ("The Internet has no territorial boundaries. To paraphrase Gertrude Stein, as far as the Internet is concerned, not only is there perhaps 'no there there,' the 'there' is *everywhere* where there is Internet access."). Patent protection is all about boundaries. An applicant has the right to obtain a patent only if he can describe, with reasonable clarity, the metes and bounds of his invention. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 730 (2002) (explaining that the patent "monopoly is a property right[] and like any property right, its boundaries should be clear"). A properly issued patent claim represents a line of demarcation, defining the territory over which the patentee can exercise the right to exclude. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014) (emphasizing that "a patent must be precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open to them" (citations and internal quotation marks omitted)).

Software, however, is akin to a work of literature or a piece of music, undeniably important, but too unbounded, i.e., too "abstract," to qualify as a patent-eligible invention. *See Microsoft*, 550 U.S. at 447–48 (explaining that software "instructions . . . detached from any medium" are analogous to "[t]he notes of Beethoven's Ninth Symphony"). And, as discussed previously, given that generic computers are both omnipresent and indispensable, they are incapable of providing structure "sufficiently definite to confine the patent monopoly within rather definite bounds," *Benson*, 409 U.S. at 69. In short, because directing that software should be applied via standard comput-

er elements is little different than stating that it should be written down using pen and paper, generically-implemented software lacks the concrete contours required by section 101. *See Alice*, 134 S. Ct. at 2352 (emphasizing that "merely requiring generic computer implementation" does not remove claims from the realm of the abstract).

Declaring that software implemented on a generic computer falls outside of section 101 would provide much-needed clarity and consistency in our approach to patent eligibility. It would end the semantic gymnastics of trying to bootstrap software into the patent system by alleging it offers a "specific method of filtering Internet content," *see BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016), makes the computer faster, *see Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337–39 (Fed. Cir. 2016), or the Internet better, *see DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014), just to snuggle up to a casual bit of dictum in *Alice*, 134 S. Ct. at 2359. Software runs computers and the Internet; improving them up to the current limits of technology is merely more of the same. The claims at issue in *BASCOM, Enfish,* and *DDR*, like those found patent ineligible in *Alice*, do "no more than require a generic computer to perform generic computer functions," *Alice*, 134 S. Ct. at 2359. Eliminating generically-implemented software patents would clear the patent thicket, ensuring that patent protection promotes, rather than impedes, "the onward march of science," *O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 113 (1853), and allowing technological innovation to proceed apace.

# United States Court of Appeals for the Federal Circuit

---

**INTELLECTUAL VENTURES I LLC,**
*Plaintiff-Appellant*

**v.**

**SYMANTEC CORP.,**
*Defendant-Cross-Appellant*

**TREND MICRO INCORPORATED, TREND MICRO, INC. (USA),**
*Defendants-Appellees*

---

2015-1769, 2015-1770, 2015-1771

---

Appeals from the United States District Court for the District of Delaware in Nos. 1:10-cv-01067-LPS, 1:12-cv-01581-LPS, Chief Judge Leonard P. Stark.

---

STOLL, *Circuit Judge,* dissenting in part.

I concur in the result reached by the majority except with respect to the '610 patent. I would affirm the judgment of the district court that asserted claim 7 of the '610 patent is eligible under § 101.

The '610 patent confirms that the claimed invention "advantageously screen[s] computer data for viruses within a telephone network before communicating the computer data to an end user." '610 patent col. 1 ll. 59–61. The patent explains that this was a fundamental

architectural shift from prior-art virus screening, which occurred locally on an end user's computer rather than centrally as in the invention. *Id.* col. 1 ll. 10–11. This shift improved the overall security of telecommunication networks by thwarting the ability of viruses to reach and exploit end users. Using the patented invention, end users could communicate over a network "without concern of receiving various predetermined computer viruses." *Id.* col. 1 ll. 63–64; *see also Intellectual Ventures I LLC v. Symantec Corp.* (*Dist. Ct. Op.*), 100 F. Supp. 3d 371, 400 (D. Del. 2015). As IV's expert, Dr. McDaniel, testified at trial, "the key about the '610[] is because it's actually on a network, . . . it's out on the cloud. So that's a big advantage, because all of the dangerous code goes out there" and it becomes "somebody else's problem to deal with it," not the end users'. J.A. 800 (Trial Tr. 518 ll. 9–16). Additionally, as the district court noted, the patent helped solve "the problem of individual computer users having periodically to update their virus screening software locally on their computers in order to ensure adequate protection from computer viruses." *Dist. Ct. Op.*, 100 F. Supp. 3d at 400; *see also* '610 patent col. 1 ll. 20–23 (explaining that in prior art configurations "each computer user has to repeatedly upgrade the virus screening software installed on his/her computer to ensure protection from recently-discovered viruses"). Dr. McDaniel described this improvement as closing the virus "protection gap" that existed in computer networks before the '610 patent because "as soon as Symantec knows about a virus, you have got protection in your e-mail immediately." J.A. 808 (Trial Tr. 526 ll. 2–7); *see also id.* 800 (Trial Tr. 518 ll. 2–6).

I agree with the district court that the claimed invention is eligible under § 101. *Dist. Ct. Op.*, 100 F. Supp. 3d at 396–400. Analyzing claim 7 under the *Mayo/Alice* framework, I accept the majority's step-one determination that the patent is directed to the abstract idea of "virus

screening." Maj. Op. 20. But I depart from the majority's analysis at step two—the "search for an 'inventive concept'" that "'transform[s]' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2355, 2357 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294, 1298 (2012)). The majority gives short shrift to the Supreme Court's instruction that in step two we must "consider the elements of each claim both individually *and 'as an ordered combination.'" Alice*, 134 S. Ct. at 2355 (emphasis added) (quoting *Mayo*, 132 S. Ct. at 1297). The Supreme Court explained that this approach "is consistent with the general rule that patent claims 'must be considered as a whole.'" *Alice*, 134 S. Ct. at 2355 n.3 (quoting *Diamond v. Diehr*, 450 U.S. 175, 188 (1981)) (citing *Parker v. Flook,* 437 U.S. 584, 594 (1978)).

Claim 7 is eligible as an ordered combination. While the network components and virus screening software recited by the claim may themselves be conventional, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). As described above, claim 7's inventive concept is moving virus screening software from its typical location on end users' computers and deploying it instead "within the telephone network" itself. '610 patent col. 14 l. 37. Thus, the invention harnesses network architecture and exploits it by utilizing a non-conventional and non-generic arrangement of virus screening components, which improves overall network security and usability. As to this arrangement being non-conventional and non-generic, the district court had before it IV's expert testimony that the invention provided a novel solution to the protection gap problem and greatly reduced the likelihood of an end user receiving a virus when it held claim 7 eligible. I also note that the jury verdict in the Symantec case—the only one

of the consolidated cases that went to trial—found the '610 patent not invalid over the asserted prior art.  While I recognize that validity under §§ 102 and 103 is a distinct inquiry from eligibility under § 101, and may not be dispositive of § 101, the jury verdict nonetheless supports the notion that this particular ordering of the components in claim 7 was not conventional at the time.  *See Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1347 (Fed. Cir. 2015) ("[P]ragmatic analysis of § 101 is facilitated by considerations analogous to those of §§ 102 and 103 as applied to the particular case.").

The claimed invention is also markedly similar to that in *BASCOM*, where we vacated the district court's ineligibility determination on the basis of a step-two ordered combination.  *Compare* '610 patent col. 1 ll. 59–61 ("Embodiments of the present invention advantageously screen computer data for viruses within a telephone network before communicating the computer data to an end user."), *with BASCOM*, 827 F.3d at 1348 ("The claims of the '606 patent are directed to filtering content on the Internet," i.e., not on a user's local computer).  We found the abstract idea in *BASCOM* to be "filtering content," *BASCOM*, 827 F.3d at 1348–49, similar to the abstract idea of "virus screening" in this case, Maj. Op. 20.  Unlike the majority here, this court in *BASCOM* recognized that although "the limitations of the claims, taken individually, recite generic computer, network and Internet components," the patent's "particular arrangement of elements is a technical improvement over prior art ways of filtering such content."  *BASCOM*, 827 F.3d at 1349, 1350.  The court in *BASCOM* identified several concrete problems that the patent in that case addressed, much like how the patent before us addressed specific technological issues with virus screening, such as the protection gap.  Thus, the court found the claims of the *BASCOM* patent to be "more than a drafting effort designed to monopolize the [abstract idea]," *id.* at 1350–51 (quoting *Alice*, 134 S. Ct.

at 2357), because they "may be read to 'improve an existing technological process,'" *id.* at 1351 (quoting *Alice*, 134 S. Ct. at 2358 (discussing claims in *Diehr*, 450 U.S. 175)). There is no meaningful difference between *BASCOM* and this case in terms of eligibility because claim 7 also "purport[s] to improve the functioning of the computer itself," or, at the very least, the functioning of the network. *Dist. Ct. Op.*, 100 F. Supp. 3d at 400 (quoting *Alice*, 134 S. Ct. at 2359); *see also* Oral Argument at 25:30–26:17, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2015-1769.mp3 (counsel for Symantec acknowledging that, under *Alice*, a patent that improves the functioning of a network may be patent eligible under § 101).

I disagree with the majority's characterization of this case as fitting within our line of cases rendering ineligible patents that merely "perform[] otherwise abstract activity on the Internet." Maj. Op. 20. The claims at issue in those cases, like the claims at issue in *Alice*, simply invoked the Internet as a means to an end; they did not improve the security and functioning of the Internet itself. Patents that fall within that paradigm are ineligible because "the focus of the[ir] claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools." *Elec. Power Grp., LLC v. Alstom S.A.*, No. 2015-1778, 2016 WL 4073318, at *4 (Fed. Cir. Aug. 1, 2016). In contrast, claim 7 constitutes an improvement of the network itself and, thus, focuses on improving computers as tools. *See BASCOM*, 827 F.3d at 1351 (describing similar patent as "not claiming the idea of filtering content simply applied to the Internet" but rather "a technology-based solution . . . to filter content on the Internet that overcomes existing problems with other Internet filtering systems"). Describing claimed inventions similar to the one at issue here, we have said that we "are not persuaded that the invention's ability to run on a general-

purpose computer dooms the claims" if the claims "are directed to an improvement in the functioning of a computer." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338–39 (Fed. Cir. 2016) (distinguishing collection of cases involving claims which "simply add[] conventional computer components to well-known business practices").

For these reasons, I respectfully dissent from the majority opinion regarding the '610 patent and would affirm the judgment of the district court holding that asserted claim 7 of the '610 patent is eligible under § 101.